**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT W. GREEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.  7:11-CV-2354-SLB** |
| | ) | |
| **THE CITY OF NORTHPORT; SCOTT COLLINS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendants' Motion for Summary Judgment.  (Doc. 18.)[1]  Plaintiff Robert W. Green has sued his former employer, City of Northport, and Northport's City Administrator, Scott Collins, alleging that defendants discriminated against him on the basis of his race and that they retaliated against him for complaining about discrimination in violation of Title VII and section 1981.  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendants' Motion for Summary Judgment, (doc. 18), is due to be granted.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d

604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once

the moving party has met its burden, the non-moving party must go beyond the pleadings and

show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support
> the assertion by:
>
> > (A)  citing to particular parts of materials in the record, including
> > depositions, documents, electronically stored information, affidavits or
> > declarations, stipulations (including those made for purposes of the
> > motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B)  showing that the materials cited do not establish the absence or
> > presence of a genuine dispute, or that an adverse party cannot produce
> > admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state

that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw

reasonable inferences 'in the light most favorable to the party opposing the [summary

judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v.*

*Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)).  Nevertheless, the non-moving party

"need not be given the benefit of every inference but only of every reasonable inference."

*Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v.*

*City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at

380 ("When opposing parties tell two different stories, one of which is blatantly contradicted

by the record, so that no reasonable jury could believe it, a court should not adopt that

version of the facts for purposes of ruling on a motion for summary judgment.").

## II. <u>STATEMENT OF FACTS</u>

Plaintiff Robert Green was hired by defendant City of Northport as its Chief of Police

on April 17, 2006. (Doc. 19-1 at 27.)  The Chief of Police is responsible for the organization

and efficient operation of the Northport Police Department. (*Id*. at 164.)

At the time he was hired, Green acknowledged receipt of the City's Anti-Harassment

Policy, effective March 9, 2001.  (Doc. 19-1, Def. Exh. 9, at 271.)  At the same time, he

acknowledged that he had "New Employee Orientation," during which the anti-harassment

policy was explained.  (*Id*.)  According to the City's policy, "Harassment consists of

unwelcome conduct whether verbal, physical, or visual."  (Doc. 19-1, Def. Exh. 9, at 272.)

The procedures established for reporting harassment are set forth in the policy as follows:

> Any employee who feels that he/she has been subjected to any form of
> unlawful harassment can report the facts to any supervisor or manager. ***If for***
> ***any reason an employee does not feel comfortable reporting the facts to***
> ***his/her supervisor, then the employee may report the facts to the Human***
> ***Resources Director or City Administrator***. . . .  There will be no retaliation
> against anyone for reporting discrimination or harassment, or for cooperating

> with an investigation of a complaint of discrimination or harassment. ***No employee will be disciplined or penalized in any way for reporting any act of harassment or for making a complaint***, unless the investigation clearly shows that the report or complaint is false and was made for the purpose [of] damaging the reputation of a fellow employee.

(*Id*. at 273 [emphasis added].)  The City's Personnel Policies and Procedures apply to all police department employees.   (Doc. 19-3, Exh. 5, at 229.)

Defendant Scott Collins, Northport's City Administrator, began work on December 15, 2008.[2]  (Doc. 19-7 at 56.)  As City Administrator, Collins had overall responsibility for the financial and day-to-day operations of Northport.  (Doc. 19-7 at 52; doc. 19-1 at 365.) All department heads, including Green, reported directly to Collins.  (Doc. 19-1 at 88; doc. 19-7 at 52.)

On January 6, 2009, Collins came to Green and stated he had two complaints, one from Mayor Bobby Herndon about Green allegedly using a curse word at a speaking engagement and a second about Green driving a BMW that had been confiscated by the Police Department.  (Doc. 19-1 at 71-74.)  Green testified that he felt harassed by Collins

---

[2]Green testified that Collins began work on January 5, 2009.  (Doc. 19-1 at 66.)  He stated this knowledge was based on the fact that Collins was in his office  and it was in the newspaper.  (*Id*. at 66-67.)  An article appearing in the Tuscaloosa News on Thursday, December 11, 2008, reported that Collins "begins his job [as City Administrator] on Monday," which was December 15, 2008.  *See* Lydia Seabol Avant, *Northport Administrator to Evaluate City Operations*, Tuscaloosa News, Dec. 11, 2008, *available at* http://www.tuscaloosanews.com/ article/20081211/NEWS/812100237#gsc.tab=0.

because he had "never received any complaints of any kind and on his second day on the job[3]

as City Administrator he [had come] to me with two complaints.  (*Id*. at 79.)

Green testified "there is a possibility" that Herndon made up his complaint about

plaintiff's use of a curse word in public because, with the change in city administration,

Herndon may have wanted a new Chief of Police.  (*Id*. at 100.)  According to Green,

approximately one week after he was elected, Herndon had said to said Green, "[']Chief, you

are the exact person I want to see.[']  He said,  ['H]ave you heard that I am a member of the

Ku Klux Klan?[']"  (*Id*. at 99.)  Green said, "No," and Herndon then asked, "Do you think

that I am a member of the KKK," to which plaintiff replied, "I don't know; that's what I have

heard."  (*Id*.)

Green was driving a BMW that had been confiscated in a drug raid.  (Doc. 19-7 at

352.)  On January 6, 2009, Collins told Green not to drive the BMW to conferences or

"home."  (Doc. 19-1 at 89, 92.)  He lived in an apartment in Northport during the week and

he drove the BMW to his Northport apartment.  (*Id*. at 87, 92.)  Green testified that he

interpreted Collins's instructions as telling him not to drive the BMW to his home in Selma.

(*Id*. at 86-87.)  He continued to drive the BMW to his Northport apartment.

On May 20, 2009, Collins sent Green an email on May 20, 2009, regarding Green's

driving of the BMW; this email stated:

---

[3]See, *supra*, note 2.

> In the January 6th discussion I reported to you some complaints I received regarding your use of the BMW. I asked you not to drive the BMW home and to instead drive your assigned Crown Victoria Police Vehicle. It is my understanding that you drove the BMW home last night, which prompted today's email. Did you or did you not leave your assigned Crown Victoria at Police Headquarters last night, drive the BMW home and arrive at work at approximately 8:30 a.m. this morning?

(Doc. 22-1 at 2.) Green responded, "I was under the impression that you did not want me to drive the BMW to Selma. I always drive the BMW to my apartment in Northport." (*Id*.) Thereafter, Collins took the BMW and gave it to the West Alabama narcotics squad. (Doc. 19-7 at 354.)

Collins sent a memorandum to all department heads on February 25, 2009, informing them that all final personnel decisions, including discipline, were to be made by him. (Doc. 22-17 at 2.) He testified that, as City Administrator, he had the authority to correct any action of a department heads that violated City policy. (Doc. 19-7 at 211-12.)

On March 20, 2009, Collins sent an email to all department heads, asking for all employees' time sheets. (Doc. 19-8, Pl. Exh. 48, at 7.) He also told the department heads, "[B]eginning next pay period I will need to review and sign all department head time sheets and leave requests." (*Id*.) Green responded:

> Do you really want the time sheets of all employees? Perhaps you should confer with Beretta because even though there is a variation in time sheets between departments, all departments submit a final standardized time sheet to payroll. Additionally, requiring department heads to submit an absence request to you on every absence is akin to treating a department head like an employee at the bottom of his respective department instead of one at the top. Department heads in most agencies only have to submit absence requests if the absence will be for an extended period [of] time, such as a week or longer. I

6

am sure that all department heads will comply with your request, but know this, [during] the sixteen years that I have serve[d] as chief, seeking approval of a mayor, city manager, or city administrator for a short absence has never been a requirement.

(*Id*.)

Collins sent Green a reply, which stated that he was trying to get "some uniformity" in the payroll process.  (*Id*.)  He also stated, "All department heads, including me, have to submit a time sheet including all time off taken.  And know this, regardless of what has been done at other agencies this is the process that all of us will follow."  (*Id*.)

In his deposition, Green testified to a number of actions taken by Collins.  Green testified that Collins undermined his authority "[b]y performing those tasks that should have been performed by me," including changing the striping on police cars, sitting on his purchase order, and withholding the psychological reports.  (*Id.* at 157-59.)  He testified that Collins sat on his purchase orders for three to six weeks at a time.  (*Id*. at 158.)

The Northport Police Department Policies and Procedures Manual contains the procedures for  Psychological Screening, that states at § 2.3.2:

1.  All new applicants certified by the Civil Service Board for a position of Police Officer, or Police Dispatcher, with the City shall be referred by the City Administrator to properly certified professionals for a psychological screening and preparation of a psychological profile.

2.  Said psychological profile will become an integral part of the evaluation process for new police officers and promotes.  Said profiles shall be reviewed, at a minimum, by the Chief of Police, and the City Administrator, and any findings contained therein which would affect employment or promotion, or would otherwise not be to the good of the service of the City, shall be presented to the City Council for determination and disposition.

7

(Doc. 22-11 at 2; *see also* doc. 19-3 at 24-26.)   An applicant received a psychological evaluation only after he or she had been offered a position.  (Doc. 19-3 at 30.)  The purpose of a psychological evaluation is to make sure that the City has fit applicants to fill the positions of police officer.  (Doc. 19-7 at 159.)

Green had received all the psychological examination reports before Collins became City Administrator.  (Doc. 19-1 at 212-13.)  He contends this undermined his authority.  (*Id.* at 157-59, 211-12.)  He complained to Collins and Collins told Green he was not authorized to receive the reports.  (*Id.* at 147.)  Thereafter, Green received an e-mail from the Human Resources department saying the applicant had passed or failed the psychological examination.  (*Id.* at 213-14.)

Without Green's input, Collins made decisions about changing the appearance of the police vehicles by changing the striping on the vehicles.  (Doc. 19-1 at 157-60.)  Green testified that the striping of police vehicles had been an "understood responsibility" of the Chief of Police because he was responsible for the organization and efficient operation of the Police Department.  (*Id.* at 163-64.)  After becoming City Administrator, Collins started ordering police vehicles. (*Id.* at 161-62.)

Collins interviewed an applicant for a bailiff position without informing Green of the interview or including him in the interview.  (Doc. 19-1 at 160.)  According to Green, the position of bailiff is a sworn officer position, and like a police officer position, it comes under the supervision of the Chief of Police.  (*Id.* at 197-98.)  Green was the only person who

8

could order the bailiff a badge and gun. (*Id*. at 199-200.)  Green told Collins the bailiff would have to be placed under the supervision of the Police Chief and Collins agreed.  (*Id*.)

Collins sent some of the police officers to a supervisor's school despite Green's objections.  (*Id*. at 160.)  Also, Green testified that Collins would not allow him to promote an officer to sergeant and an officer to lieutenant even though Green needed to make these promotions.  (Doc. 19-1 at 347.)  Green wanted to offer the promotional exam because there was an officer who was scheduled to leave to work for another employer and Green needed to replace this officer ranking position.  (*Id*. at 347-48.)  Also, he had a vacant lieutenant position he needed to fill.  (*Id*. at 348-49.)  Green talked to Collins about filling the positions and Collins told Green to hold up on making the promotions.  (*Id*. at 349-50.)

Green testified that he was forced to supervise three problem employees, two animal control officers and one environmental officer, that no one else in the City wanted to supervise.  (*Id*. at 492.)  Complaints were lodged frequently against these employees. No other department heads wanted to supervise these employees. (*Id*.)  Other department heads made jokes about Green because he had been assigned these three employees to supervise. (*Id*. at 493-94.)

On May 1, 2009, Collins gave Green a letter regarding allegations against Green. (Doc. 22-10 at 2.) This letter stated:

> In the last ninety days I have received a number of complaints from the public, elected officials and Police Department staff regarding alleged misconduct on your behalf.  This list of allegations includes, but is not limited to:

1) Misuse of city property, 2) Selective disciplinary practices, 3) Violations of promotional practices, 4) Insubordination, and 5) Conduct Unbecoming an Officer.

You should know that I consider these reports as *allegations*, subject to an impartial review.   You should also know that complaints against city department heads are the responsibility of the City Administrator, who is next in the chain of command.   Over the next several days I will be speaking with certain Police Department employees regarding these complaints.   The City Administrator reserves the right to speak with any city employee.   Please be reminded that there shall be no disciplinary or retaliatory action taken against any employee I speak with concerning these matters, or any other matter that may arise as a result of these discussions.

I am very respectful of the fact that your position as a department head and as Police Chief subjects you to scrutiny and criticism that may be founded or unfounded.   I look forward to your cooperation and assistance, as well as that of your staff, as I work to bring a resolution to this matter.

(*Id.* [emphasis in original].)

Green testified, "[A] week later I asked [Collins] about this letter that he had presented me with all these charges and he tells me to forget about them." (Doc. 19-1 at 317.) Green testified that he believed Collins sent the letter to try to force him out as Police Chief. (*Id.*)

Green's relationship with Assistant Police Chief Sharon Crowder was good until around the time she questioned him about an employee job assignment in February 2009, and again when she appealed his one-day suspension given for an accident in April 2009, when, according to Green, Collins let Crowder jump the chain of command.  (Doc. 19-1 at 289-92, 541.)   The City of Northport Police Department has a policy regarding the chain of command.  (*See* doc. 22-15 at 2.)  This policy states, "The chain of command within the

10

police department is intended to provide a clear avenue for communication between [s]upervisors and subordinate officers, and to provide established methods of appeal, when conflicts exist." (*Id.*)

On February 25, 2009, Crowder sent Green an email suggesting that Stacy Simerly, a part-time evidence custodian, be removed from the supervision of Janis Green, Chief Green's Administrative Assistant, and be placed under the supervision of the Criminal Investigation Division [CID] Sergeant. (Doc.19-8, Def. Exh. 49, at 36; doc. 19-1 at 451.) Green responded:

> Your request appears to be plausible, however, I am going to wait for the following to happen before I honor the request:
>
>> 1.  The current tension that exists between you, Stacy Simerly, and Janis Green subsides.
>
>> . . .
>
> I don't know what's going on with you, but something is amiss.  You snapped at me twice in the last seven days.  I have chose[n] to use the *avoidance strategy* because I am not going to allow any officer at this department to disrespect me, and I most definitely will not allow my assistant chief to disrespect me.  I am going to wait patiently until you get over whatever it is that's bothering you."

(*Id.* [emphasis in original].)

Green testified that Janis Green and Stacy Simerly had complained to him about Crowder.  (Doc. 19-1 at 542.)  Simerly had complained Crowder did not like her.  (*Id.*)  Janis Green had also complained that Crowder did not like her and she told Green that Crowder always gave her the cold shoulder.  (*Id.*)

Crowder testified that she did not know there was tension between her and Simerly and Janis Green.  (Doc. 19-3 at 81.)  However, she did not discuss the issue with Green because he had told her he was going to avoid her.  (*Id*. at 332-33.)  Despite Green's avoidance strategy, Crowder continued to meet with Green when he called a meeting and continued to handle police department business.  (*Id*. at 98.)

Crowder met with Collins regarding the "avoidance strategy" email on February 27, 2009.  (Doc. 19-1 at 265-66; *see also* doc. 23-2 at 2.)  On March 2, 2009, Crowder sent an email to Collins in which she recounted that Green had asked her about her visit to Collins on February 27, 2009.  (Doc. 23-2 at 2;  doc. 19-3 at 338.)  Crowder told Collins that Green had accused her of violating the chain of command.  (Doc. 23-2 at 2.)  Crowder responded that she could go to Collins under City policy because she did not feel like she could talk to Green about his email.  (*Id*.)  Green told Crowder she could have talked to him.  (*Id*.)   Green gave Crowder a verbal discipline for failing to follow the chain of command.  (Doc. 19-1 at 264-65.)   Collins did not believe that Crowder's complaints at that time required his attention.  (Doc. 19-7 at 299.)  Between March 30, 2009, and April 27, 2009, Crowder made numerous complaints to Collins and Collins testified that he "thought that the majority of the matters raised could have been handled by two adults.  (Doc. 19-7 at 296-97; *see also id*. at 295, 298-308.)

Green's secretary, Lou Draper, testified she had witnessed Crowder talking to herself – like she was carrying on a conversation in her head; Draper said Crowder was not "talking

to somebody that wasn't there." (Doc. 19-2 at 19-20.) Draper also heard rumors that Crowder was afraid of the dark and afraid to be in the office alone. (*Id*. at 20.) She testified that Crowder's office looked "slightly disorganized" from in front of her desk, but behind her desk "there was literally trash, crumbled up papers on the floor . . . four or five inches deep." (*Id*. at 22.) She said that Crowder's chair sat in the middle of the papers on the floor. (*Id*. at 22-23.)

According to Green, Crowder had started turning on the lights in all the offices and the conference room. (Doc. 19-1 at 345.) He also said she had asked him if she could put a door stop to prop open the door that opens to the hallway to her office; Green gave her permission and never objected to her request. (*Id*.) He also testified that Crowder had stopped picking up her reports and would leave them in her incoming basket. (*Id*. at 345-46.)

On April 28, 2009, Crowder, driving her police department vehicle, backed into a utility pole in her driveway. (Doc. 19-3 at 103; *see also* doc. 19-7, Pl. Exh. 44, at 151; doc. 19-8, Pl. Exh. 44, at 1.) The accident caused an estimated $1,879.70 of damage to the vehicle. (Doc. 19-7, Pl. Exh. 44, at 150.) Green informed Crowder that she would receive a one-day suspension, which was the same discipline he had imposed on other police officers involved in traffic accidents. (Doc. 19-1 at 292-93.) Green testified that he could only recommend a one-day suspension; the final decision was for Collins. (Doc. 19-1 at 306-07.) He had recommended and applied the same rule of discipline for all employees that had an

accident, and he had recommended a one-day suspension for eight or nine other officers that had accidents.  (*Id*. at 292-93; *see also* doc. 19-9 at  80-81; *see generally* doc. 22-3.) Crowder told Green she would appeal the suspension.  (Doc. 19-3 at 366-67.)

Before Green could take any disciplinary action against Crowder or even fill out the paperwork to confer with the City Administrator or Human Resources Director, Jeff Standifer, about disciplining Crowder, Crowder met with Collins to complain.  (Doc. 19-1 at 292.)  She sent Collins an e-mail on April 28, 2009, telling him that Green had come to her to ask when she was taking her one day suspension.   (Doc. 23-8 at 2.)  The following day, April 29, 2009, Crowder went to Collins's office and told him she wanted to appeal.  (Doc. 19-3 at 140.)  Thereafter, Collins asked Green about a pre-disciplinary hearing for Crowder. (Doc. 19-1 at 296.)  Green asked Collins how he knew about Crowder's discipline when he had not even taken any disciplinary action against Crowder.  (*Id*.)  At this point he learned that Crowder had spoken with Collins.

On April 30, 2009, Green met with Crowder and told her that "if [she] contacted [Collins] again that he was going to take disciplinary action against [her]."  (Doc. 19-3 at 141-42.)  Crowder informed Collins about her meeting with Green and, on May 1, 2009, she told him she "wish[ed] to file a formal intimidation complaint."  (Doc. 19-6, Pl. Exh. 36, at 156; doc. 19-3 at 175-76.)  In her statement, she noted:

> Due to my contacting you requesting that my pre-disciplinary [hearing] be held
> as quickly as possible I was told on Thursday, April 30, 2009[,] that he would
> be putting a written reprimand in my personnel file for violating the chain of
> command. He said that I could not talk to you.  He said that he warned me

14

when I contacted you about an e-mail that he had sent me that I violated the chain of command because I had to go through him first.  Regarding the e-mail that he sent me on 2/26/09, that e-mail was evidence of a hostile work environment and I had every right to contact his supervisor which is you.  On April 30th he cited that as a violation of the chain of command and then said that I violated it a second time when I made my request for a speedy pre-disciplinary hearing.  He said if I contacted you again I would get suspended for a day.

Chief Green is not going to intimidate me by making threats.  . . .

(*Id.*)  Crowder testified that she believed the City's harassment policy allowed her to go straight to the City Administrator or HR Director for protection.  (Doc. 19-3 at 176-78, 182.)

Other than Crowder, Green disciplined Stacy Cooper and Steve Ward for meeting with Collins without his permission.  (Doc. 19-1 at 126-27.)  Green gave Steve Ward a verbal reprimand for going outside the chain-of-command and placed a copy of the disciplinary action in his personnel file.  (Doc. 19-1 at 262-63.)  He gave Stacy Cooper a verbal reprimand for going outside the chain of command and placed a copy of the disciplinary action in her personnel file.  (*Id.* at 263.)

On April 10, 2009, Green complained to Collins about Collins failing to follow the chain of command and the problems with Collins directly contacting officers.[4]  (*See* doc. 22-

---

[4]On April 10, 2009, Green sent Collins an e-mail, which stated:

When you send a request or complaint to my department and send a complimentary copy to other officers or personnel within the department, it causes a problem.  Officers will generally respond to your complaint before I have had an opportunity to confer with them.  . . .  If a complaint or request is forwarded to me from your office, I should be the responding party.

16.)  Collins testified he did not have to "adhere to Green's chain of command."  (Doc. 19-7 at 364.)

On May 6, 2009, the City conducted Crowder's pre-disciplinary hearing regarding her April 28, 2009, vehicle accident.  (*See* doc. 22-5 at 5.)  Immediately after the conclusion of the pre-disciplinary hearing, Green told Collins that he was "getting ready to change [Crowder's] duties.  (Doc. 19-8, Pl. Exh. 56, at 69 [transcript pages 70-71].)

The following Monday, May 11, 2009, Collins notified Crowder in writing that she would not be subject to the suspension proposed by Green for "Conduct Unbecoming an Employee" regarding her vehicle accident.  (Doc. 19-3 at 379; doc. 19-3, Def. Exh. 11, at 160.)  He stated, "This accident is appropriate for a hearing by the Accident Review Board and is subject to any Board recommendations offered as a resolution to this accident."  (Doc. 22-18 at 2; doc. 19-7 at 224-25.)  However, Crowder never attended any accident review board meeting regarding the accident and she never received any report or findings from the Accident Review Board regarding this accident.  (Doc. 19-3 at 311.)

On May 13, 2009, Green sent an e-mail to Crowder stating that she "should . . . receive a memorandum tomorrow regarding some much needed supervisory changes."  (Doc. 19-3, Def. Exh. 12, at 161.)  He did not specify what the changes were or consult with her regarding the changes.   (Doc. 19-3 at 382, 384.)

_____

(Doc. 22-16 at 2.)

The following day, May 14, 2009, Janis Green posted the memorandum on a bulletin board at the police department.  (Doc. 19-1 at 425-26.)  The memo announced a number of changes that would affect Crowder's duties and responsibilities:

> Effective the date of this directive the following supervisory changes will become effective:
>
> 1.   The assistant chief will be responsible for supervising the Training Division and the Front Desk Staff.
>
> 2.   The following Divisions and Units will come under the direct supervision of the Chief of Police:  The Environmental Unit, the Crime Prevention Unit, the Records Division, and the Criminal Investigations Division.  All other assignments that were previously made will remain unchanged.
>
> The aforementioned changes should reduce bureaucracy and improve operational efficiency.

(Doc. 19-7, Pl. Exh. 43, at 148; *see also* doc. 19-3 at 202.)  According to Green he made the changes because Crowder was not performing her job duties and he had been performing the bulk of her duties in these areas.  (Doc. 19-1 at 427-28.)  He testified:

> [E]very time [Crowder] had any kind of problems in records, criminal investigation division, when someone came to complain, she would simply tell them that they needed to see me.  . . .
>        . . .
>
> So I said, well, records and CID [are] very important to me, so she is not going to handle those duties and responsibilities, I am going to take that away from her and give her something else.

(*Id*. at 418-19.)  He did not speak to Crowder about any problems with her performance and he did not tell her about the pending changes.  (*Id*. at 421-22, 424, 427; *see also* doc. 19-3

at 203, 384.)  Green said he he had been planning to make some changes to Crowder's duties

for around five months.  (Doc. 19-1 at 422, 427.)

On the same day, May 14, 2009, Green filed his first EEOC Charge setting forth his

claims of race discrimination against the City Administrator, Scott Collins.  (Doc. 22-7.)

This Charge stated:

> On January 6, 2009[,] the newly hired city administrator . . . started subjecting
> me to harassment and intimidation in the work place for no apparent reason.
> Since January 6, 2009, White employees assigned to the police department
> have started going through the city administrator in lieu of addressing work
> related problems through the police chain of command.  The city administrator
> has continued to negate the vested authority I have as the chief of police.  I am
> being challenged for the least deviation in my management of the police
> department.  I have not protested the behavior of the city administrator because
> of the various close social relationships the administrator has with White
> employees in the police department.  On May 11, 2009, the city administrator
> informed me that I could not discipline the White female assistant police chief,
> after she had damaged a police vehicle through driver neglect.

(Doc. 19-2 at 37.)  The EEOC mailed a copy of Green's first EEOC Charge to the City on

May 19, 2009.  (Doc. 22-9 at 2.)  Collins also received a copy of Green's May 14, 2009,

EEOC Charge.  (Doc. 19-7 at 116.)

Green sent his first request, via email, to meet with the City Council to William

Tunnell, Council President, around May 20, 2009, because Green wanted to complain about

Collins's harassing conduct.  (Doc. 19-1 at 336-37.)  The City Council never met with Green.

(*Id.* at 328, 336.)

The City sent a Notice of Pre-Disciplinary Hearing to Green on May 29, 2009.  (Doc.

22-6 at 2-3.)  This Notice stated:

18

DISCIPLINARY ACTION IS BEING SOUGHT AGAINST YOU ON THE FOLLOWING CHARGES:

1.  Threat to reprimand an employee for participating [in] the Civil Service disciplinary appeal process which resulted in her pre-disciplinary hearing conducted on May 6, 2009.

2.  Retaliation against [the] same employee as set out in your May 14, 2009, memo regarding Police Department assignment changes following her participation in her pre-disciplinary hearing.

(*Id.*)

On June 2, 2009, Plaintiff filed his second EEOC Charge regarding his claims of racial discrimination and retaliation and faxed Scott Collins a copy of his Charge on the same day.  (Doc. 22-8.)  The Amended EEOC Charge stated "Since I filed [the May 14, 2009,] charge I have been summoned for a hearing where possible disciplinary action may be taken. I have never been disciplined for anything since I took the Chief's job in 2006.  I received notice of my hearing 10 days after I filed my charge of discrimination."  (Doc. 19-8 at 18 [emphasis in original].)

On June 8, 2009, Green attended his Pre-Disciplinary Hearing before Collins.  After the pre-disciplinary hearing, Collins issued a decision finding Green had retaliated against Crowder and proposing that Green be suspended for ten working days.  (Doc. 19-8, Pl. Exh. 56, at 91.)  Collins set forth his reasons for suspending Green in his Decision Upon Pre-Disciplinary Hearing.  (*See id*. at 83-92.)  In this Decision, Collins stated:

It has been determined that Chief Green retaliated against Assistant Chief Crowder by threatening to reprimand her on April 30, 2009, for exercising her rights under the City's Anti-Harassment Policy.  Chief Green's

19

lack of knowledge about an employee's right to report alleged harassment or question city policy, or that reprimanding an employee for going to the HR Manager or the City Administrator under those circumstances could be considered retaliation is not a defense. Accordingly, I find that Chief Green did retaliate against Assistant Chief Crowder by threatening to reprimand her for pursuing her rights under the City's Anti-Harassment Policy.

Regarding the subsequent "Supervisory Changes," it is clear that Chief Green created a hostile environment with his Assistant Chief by telling her in an e-mail that he had an "avoidance strategy" and would no longer deal with her until she resolved her "problems." As a result, communications between the two declined. However, Chief Green cannot use this fact to justify taking away significant parts of the Assistant Chief's duties and responsibilities. Chief Green has an obligation to effectively manage the employees of the Police Department, particularly the Assistant Chief and senior staff. It is a situation as manager of the entire Police Department that the Chief neglected to correct. In this set of circumstances the defenses put forth by Chief Green regarding his actions are not justified.

Additionally, the timing of his "Supervisory Changes" memo is of concern. Assistant Chief Crowder was promoted to her current position effective October 23, 2006. Chief Green was responsible for assigning the duties and responsibilities for the Assistant Chief of Police. Those duties and responsibilities [had] remained unchanged until his May 14, 2009, memo. In his hearing Chief Green asserted that he had thought about and/or considered these changes or similar changes for months, dating back to 2007. However, he chose not to make any changes until after participating in Assistant Chief Crowder's Pre-Disciplinary Hearing on May 6th. Within days of that hearing, during which Assistant Chief Crowder challenged Chief Green and told him she believed she was being treated unfairly and subjected to a hostile environment, Chief Green took away the greater balance of her supervision and authority, transferred it to himself, and replaced it with less substantive duties. It is significant that Assistant Chief Crowder never requested any of the changes, she did not formerly hold a majority of the replacement duties, that Chief Green never discussed the proposed changes with her, and that he decided to make this only after Assistant Chief Crowder's Pre-Disciplinary hearing and being notified of the results of that hearing.

Accordingly, Police Chief Robert Green will be suspended for ten (10) working days without pay commencing Monday July 20, 2009.

(*Id*. at 90-91.)

In August, the Civil Service Bard upheld Green's suspension but reduced it from ten days to five days.

Collins was allowed to participate in the investigations of Green's claims in his EEOC Charges. (Doc. 19-7 at 118.)  According to Collins, his participation was limited to notifying legal counsel and scheduling a meeting; he does not remember any other involvement in the investigation of Green's EEOC charge. (*Id*. at 118-20.)  Internal complaints of harassment, discrimination or retaliation are initially investigated by Human Resources.  (*Id*. at 74-75, 80.)  External complaints, like an EEOC charge, involve legal counsel.  (*Id*. at 81-82.)  Jeff Standifer, HR Director, testified there was an investigative team that would be assembled to investigate complaints, but he does not recall the investigative team ever being assembled to investigate any complaints made by Crowder or complaints against Green.  (Doc. 19-9 at 109-10.)

On December 16, 2009, Collins came to the Police Department sometime between 4:00 p.m. and 4:45 p.m. (Doc. 19-2 at 25-26.)  He went into Green's office and slammed the door.  (*Id*. at 27.)  Lou Draper, Green's secretary, testified that it was not normal for a door to be slammed in the office.  (*Id*. at 28.)  Collins testified that he did not remember slamming the door , but he "probably did."  (Doc. 19-7 at 331.)

Collins testified he told Green "that [he] may bully other people but [he] was not going to bully [Collins]." (Doc. 19-7 at 325.)  Collins testified that he was aware that Green

had bullied Sharon Crowder and Jeff Standifer and he was determined to have the conversation with Green without "get[ting] pushed."  (*Id*. at 325-26.)  He also admits to telling Green that needed to decide whether he wanted to stay as the police chief.  (*Id*. at 323.) Collins testified that he did not recall pointing his finger at Green.  (*Id*. at 323-24.)  He admits raising his voice was inappropriate and he should not have yelled at Green.  (*Id*. at 314, 323-24, 330, 357-58.)   He also acknowledged that such conduct could be unwelcome conduct under the City's anti-harassment policy.  (*Id*. at 316-17.)

Green told Collins words to the effect that Collins was not going to yell at him like he was a little kid.  (*Id*. at 324.)  Draper heard Collins say to Green, "Don't you dare raise your voice at me."  (Doc. 19-2 at 29.)  She testified she never heard Green raise his voice or speak above a murmur during the conversation with Collins.  (*Id*. at 29, 31.)  However, she testified Collins was shouting in a "furious voice."  (*Id*. at 29.)  Draper testified Collins'[s] voice was still raised when he opened the door to Green's office to leave.  (*Id*. at 32.)

On December 21, 2009, Green made a second written request to the City Council President to meet with the Council to complain about Collins harassing him and subjecting him to a hostile environment.  (Doc. 19-1 at 337-38, 340; doc. 22-14.)  In this letter, Green stated:

> It is unfortunate that I must forward this writing to the Northport governing body during this festive holiday season, however, [this] matter is of paramount importance.   Please note the following regarding the Northport Anti-Harassment Policy.

**Definition**

Harassment consists of *unwelcome conduct* whether *verbal, physical,* or *visual*. Any such conduct or statement, including practical jokes or taunting, that interferes with any employee's ability to perform his/her job, or which creates a *hostile, offensive,* or *intimidating working environment*, will not be tolerated.

**To Wit:** The city administrator became enraged on Wednesday, December 16, 2009[,] after being notified that the Department of Labor would be contacted to provide clarification on the matter of compensatory time and the revised designated work hours for the office of the chief of police.  The city administrator had consistently provided inconsistent feedback on the two matters.  After the city administrator received an e-mail from my office regarding the aforementioned matter, he immediately came to the police department and did the following:

- Stormed into my office

- Slammed my office door behind him

-  Pointed his finger at me

- Literally screamed at me [while] telling me that he was tired of me questioning him and being confrontational

- Yelled and pointed his finger once again and told me that I needed to decide whether I wanted to stay here – meaning the police department or police chief

- When I responded and told the city administrator that he was not going to yell and scream at me like I was a little kid

- The city administrator responded in a very harsh and boisterous[5] tone that he would talk to me any way he wanted to

---

[5]The court presumes Green does not use this term to indicate Collins acted with exuberance or high spirits.  Rather the court assumes Green means that Collins was loud and animated during his conversation with Green.

- The city administrator made mention of the compensatory time and I responded by telling him that I was following instructions that he gave at the department head meeting on Thursday, December 10, 2009.

- The city administrator then literally screamed and pointed his finger at me once again and told me he didn't care what I was talking about

- The city administrator subsequently open[ed] my office door and started to leave and immediately turned around[,] slammed the door, and in a very loud tone told me that I had bigger problems to worry about.

- The city administrator then left my office and slammed the door behind him.

      . . .

   The hostile environment created by the City Administrator – Scott Collins [–] on December 16, 2009[,] had the potential of escalating into something even more egregious, hence, therein lies the urgency of bringing this matter to the attention of the city administrator's supervisors.

(Doc. 22-14 at 2-3 [emphasis in original; footnotes added].)  This letter does not mention that Green considered the hostile environment to be based on his race or retaliation for complaining about race discrimination.  (*Id*.)  Rather, he contends that Collins berated him on this occasion because he had stated that he was going to contact the United States Department of Labor regarding issues with his work hours.  (*Id*.)

   Green testified that he copied Collins on his second request to meet with the Council and that Collins told him the Council would not meet with him.  (Doc. 19-1 at 338.)  Collins testified he does not remember if he was ever informed of Green's complaints or that Green sent this complaint letter to the City Council.  (Doc. 19-7 at 320-21.)  The City Council never

24

met with Green to discuss his complaints of harassment and hostile environment regarding Collins. (Doc. 19-1 at 341.)

Collins does not recall ever being contacted or questioned about Green's complaints of harassment and hostile environment. (Doc. 19-7 at 322.) He was never disciplined for this conduct. (*Id*. at 319.) Also, he never apologized to Green for his conduct because he "wasn't sorry for it." (*Id*. at 317.)

In 2010, plaintiff was the only African-American department head working for the City. (Doc. 19-1 at 488-89.) He retired on July 1, 2012. (*Id*. at 27.)

## III. <u>DISCUSSION</u>

Plaintiff's Amended Complaint contains three counts – race discrimination by the City, retaliation by the City, and race discrimination and retaliation by Collins in his individual capacity. (*See generally* doc. 4.) In his response to defendants' Motion for Summary Judgment, plaintiff asserts that he was suspended and suffered a hostile work environment on the basis of his race, African-American, and in retaliation for complaints of

race discrimination.[6]  Therefore, the court finds plaintiff's claims are limited to these adverse actions.

## A.  RACE DISCRIMINATION

### 1.  Suspension

Defendants argue that plaintiff cannot prove that Collins's reasons for suspending him were pretext for unlawful race discrimination.  According to Collins's written decision, Green was suspended for "retaliat[ing] against Assistant Chief Crowder by threatening to reprimand her on April 30, 2009, for exercising her rights under the City's Anti-Harassment Policy," and by taking "away the greater balance of her supervision and authority" on May 14, 2009.  (Doc. 19-8, Pl. Exh. 56, at 90-91.)  Green contends that he has direct evidence of discriminatory intent, based on statements made by Herndon and Collins, and that he has circumstantial evidence that Collins's articulated reasons for his suspension, are unworthy of belief and the real reason he was suspended was because of his race.

---

[6]In his brief in response to defendants' Motion for Summary Judgment, Green states, "Collins singled out Green and treated him differently than his Caucasian counterparts.  After Green complained about Collins, Collins issued a ten-day suspension against Green.  ***This adverse job action as well as the racially hostile working environment to which Green was exposed creates triable issues*** and Plaintiff respectfully requests this Court deny Defendant's Motion for summary judgment."  (Doc. 25 at 3 [emphasis added].)  The court assumes that Green's claims are based on his suspension and a hostile work environment and that the other allegations of adverse employment actions are not asserted as discrete claims.

### a. Direct Evidence

As direct evidence of race discrimination, plaintiff points to two statements (1) Collins's statement that "he was going to get rid of that black son-of-a-bitch who drives the BMW," and Herndon's statement, "Have you heard that I am a member of the Ku Klux Klan?" Green contends that these "racist comments are direct evidence of . . . discrimination [sufficient] to establish [defendants'] allegedly legitimate reasons for Plaintiff's suspension and harassment were pretextual." (Doc. 25 at 64.) The court disagrees.

"Direct evidence of discrimination is 'evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee' and 'that, if believed, proves the existence of a fact without inference or presumption.'" *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)); *see also Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1358-59 (11th Cir. 1999)("We have defined direct evidence of discrimination as evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.)(internal quotations and citations omitted).

### i. Collins's Statement

By separate Order, the court has excluded Green's testimony regarding what he was told by Collins's former father-in-law regarding Collins's statements about Green driving the BMW. Such statement is not admissible and, therefore, has not been considered by the court.

27

### ii. Herndon's Statement

The second statement that plaintiff alleges is direct evidence of discrimination is Herndon's statement to Green, asking Green if he had "heard [Herndon was] a member of the Ku Klux Klan."[7]  This statement is not direct evidence that plaintiff was suspended because of his race.  Nothing in the statement, which was made months before Collins decided to suspend Green, links Herndon's supposed racial animus to Collins's decision to suspend the plaintiff or the Civil Service Board's decision to uphold the suspension, but to reduce it to five days.  Moreover, nothing in the record indicates that Herndon was involved in the decision in any manner.  Therefore, the court finds Herndon's question to Green regarding his knowledge of Herndon's membership in the KKK is not direct evidence that Green's suspension was based on his race.

The court finds that plaintiff has not presented direct evidence that plaintiff was suspended because of his race.

### b.  Circumstantial Evidence

Because the court finds that plaintiff does not have direct evidence, the court's analysis of his race discrimination claims based on his suspension is governed by the tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Department of Community Affairs v.*

---

[7]According to Green's testimony, this statement was made after Herndon's rival for the mayor's office had told him that Herndon was a member of the Ku Klux Klan.  Neither party has argued that Herndon is or was a member of the Ku Klux Klan.

*Burdine*, 450 U.S. 248 (1981).  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.

133, 142 (2000).  The Supreme Court has explained this framework as follows:

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  . . .  The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment.  [When the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff suffered an adverse employment action for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .
>
> Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff – once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Id. at* 142-43 (internal citations and quotations omitted).

For purposes of deciding defendants' Motion for Summary Judgment, the court

assumes that plaintiff can establish a prima facie case of race discrimination with regard to

his suspension because it finds, as a matter of law, he has not shown that the reasons for his

suspension are unworthy of credence or that the real reason was his race.  *See Chapter 7*

*Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012)(" Because it does not

matter to the result, we will assume, as the district court did, that [plaintiff] has established a prima facie case of race discrimination."); *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)("It matters not whether [plaintiff] has made out a prima facie case if she cannot create a genuine issue of material fact as to whether [defendant's] proffered reasons for firing her are pretext masking discrimination.  For that reason, we will assume that [plaintiff] has established a prima facie case of discrimination.")(internal citations omitted).

The law in this circuit is well established:  A plaintiff may not establish pretext merely by quarreling with the wisdom of the alleged discriminatory and/or retaliatory decision. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).[8]  "A plaintiff may

---

[8]In *Combs*, the Eleventh Circuit held:

In relying on [the comparator's] financial improprieties to undermine [defendant's] explanation that it based its promotion decision on [the comparator's] superior supervisory experience, [plaintiff] confuses *disagreement* about the wisdom of an employer's reason with *disbelief* about the existence of that reason and its application in the circumstances. Reasonable people may *disagree* about whether persons involved in past financial improprieties should be made supervisors, but such potential disagreement does not, without more, create a basis to *disbelieve* an employer's explanation that it in fact based its decision on prior non-financial supervisory experience.  [Defendant's] decision to promote [the comparator] instead of [plaintiff] may seem to some to be bad business judgment, and to others to be good business judgment, but federal courts do not sit to second-guess the business judgment of employers.  Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer.

30

show pretext by either directly persuading the court that a discriminatory reason motivated the employer, or by indirectly showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  The relevant inquiry on the issue of pretext is "highly focused" – "The district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct."  *Combs*, 106 F.3d at 1537-38 (11th Cir. 1997)(citing *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).

    "To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision."  *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(Johnson, J, concurring)(citations omitted). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it."  *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1350 (11th Cir. 2007)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004)).

---

*Combs*, 106 F.3d at 1543 (11th Cir. 1997)(emphasis in original).

In order to establish that a defendant's articulated reason is not worthy of credence –

> "[a] plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [race or retaliation]." [*Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000)]. The role of this Court "is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments." *Id.* at 1254. "Our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." [*Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)]. Whether [Green actually retaliated against Crowder] is not an issue for this Court to referee."

*Wilson*, 376 F.3d at 1092. "In other words, it does not matter whether the plaintiff is actually innocent of the infraction for which the adverse employment action is taken; the only relevant inquiry is whether the employer believes he is guilty." *Masso v. Miami-Dade County*, No. 06-16611, 247 Fed. Appx. 190, 192 (11th Cir. Sept. 6, 2007).[9] "No matter how medieval [an employer's] practices, no matter how high-handed its decisional process, no matter how mistaken [its] managers, [Title VII] does not interfere. Rather [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000)(quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991))(other citations omitted).

As evidence that defendants' articulated reasons for suspending him are unworthy of credence, Green argues that Herndon and Collins's "racist comments are direct evidence of

---

[9]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it. ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***." 11th Cir. R. 36-2 (emphasis added).

. . . discrimination [sufficient] to establish their allegedly legitimate reasons for Plaintiff's suspension . . . were pretextual," or "powerful statements relating to circumstantial evidence." (Doc. 25 at 64-65.)  However, as set forth above, the court will not consider Watkin's statement to Green regarding Collins's reference to him as a "black SOB," and plaintiff has presented no evidence that Herndon was involved in any way in the decision to suspend him.  Therefore, the court finds that Green's evidence of alleged racist comments does not rebut or call into question defendants' articulated reason for his suspension.

In the section of his Opposition discussing his retaliation claims, Green contends he did not actually retaliate against Crowder.[10] (Doc. 25 at 69-70.)  However, "Whether [Green actually retaliated against Crowder] is not an issue for this Court to referee."  *Wilson*, 376 F.3d at 1092.  "[T]he only relevant inquiry is whether [Collins] believe[d] [Green] was guilty" of retaliating against Crowder.  *See Masso*, 247 Fed. Appx. at 192.

Green does not address Collins's finding that Green had threatened Crowder with discipline for engaging in protected activity – complaining to Collins that Green was harassing her.  Moreover, Green's articulated reasons for changing Crowder's job duties, even if legitimate, do not alone prove that Collins did not believe that Green had taken this action in retaliation for Crowder's decision to appeal her suspension.  Therefore, the court

---

[10]Green does not include this discussion within his argument in opposition to summary judgment on his race discrimination claims based on his suspension.  Nevertheless the court recognizes that this argument is relevant to both his race discrimination and his retaliation claims based on his suspension.

finds Green has not shown substantial evidence that the reasons given by Collins for Green's suspension were not the real reasons for Collins's decision.

Lastly, Green argues that the court can find that Collins's reason for his suspension is a pretext for race discrimination based on the "overwhelming circumstantial evidence of Collins'[s] determination to rid the [City] of its only African American department head." (Doc. 25 at 65.)  According to Green, this circumstantial evidence includes the following:

1.      Collins yelled and pointed his finger at Green in December 2009;

2.      Collins complained about Green driving the BMW;

3.      Collins sent Green a letter, dated May 1, 2009, "containing false allegations;"

4.      Collins refused to provide Green with psychological reports on all Police Department applicants;

5.      Collins allowed Crowder to violate the chain of command;

6.      Collins did not allow Green to promote two employees in the Police Department;

7.      Collins made decisions regarding striping patrol cars;

8.      Collins interviewed applicants for positions that Green was authorized to fill; and

9.      Collins did not sign Green's purchase orders in a timely fashion.

(Doc. 25 at 66-67.)

This circumstantial evidence, however, does not address "head on" Collins's articulated reasons for suspending Green.  Moreover, consideration of these incidents does not support a finding that Collins's articulated reasons for suspending Green – the incident

34

of threatened discipline against Crowder and the reduction in Crowder's duties following her appeal of her suspension – are unworthy of credence and/or that the real reason Collins suspended Green was because of his race.      The court finds that Green has not submitted sufficient evidence to support a finding that defendants' articulated reasons for suspending him are unworthy of credence and that the real reason for his suspension was his race.

Therefore, defendants' Motion for Summary Judgment as to plaintiff's race discrimination claims based on his suspension is due to be granted and such claims will be dismissed.

### 2.  Hostile Work Environment

"Title VII [and Section 1981] prohibit[ ] the creation of a hostile work environment." *Vance v. Ball State University*, 133 S. Ct. 2434, 2441 (2013)(citations omitted).  In a hostile work environment case, "the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered."  *Id.* at 2441 (citations omitted).   "When the workplace is permeated with racially discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII [and Section 1981 are] violated."  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012)(quoting *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) and citing *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010))(internal quotations omitted); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

An employer is therefore liable to an employee for a racially hostile work environment under both statutes if the employee proves that:

> (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability.

*Id.* (quoting *Edwards*, 602 F.3d at 1300).   The Eleventh Circuit has held:

> It is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010)(en banc). Therefore, only conduct that is "based on" a protected category, such as race, may be considered in a hostile work environment analysis. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584 (11th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted." *Id*. at 583; *see also Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301-02 (11th Cir. 2007)("Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category . . . ."). This "inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998).

*Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012); *see also Laosebikan v. Coca-Cola Co.*, 167 Fed. Appx. 758, 765 (11th Cir. 2006). Plaintiff has not presented evidence that the conduct at issue related to his race. The acts themselves do not involve racist statements or overt insult and intimidation related to Green's race. Indeed, he testified

36

that he believed Collins acted with the purpose to undermine his authority to get rid of him when the administration changed.  (Doc. 19-1 at 385.)

Even if plaintiff had evidence on which a reasonable juror could find that Collins's conduct was based on Green's race, his evidence is still insufficient to establish a hostile environment claim.

"The fourth element – that the conduct complained of was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment – is the element that tests the mettle of most [hostile environment] harassment claims." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000).  "While not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute adverse action under Title VII." *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).

Defendants contend that plaintiff cannot establish a hostile work environment claim because he cannot show that the alleged conduct was sufficiently severe or pervasive to alter the terms and conditions of his employment.  (*See* doc. 18 at 32-37.)  Plaintiff does not directly address defendants' contentions, rather he states:

> As outlined extensively above, Collins racially harassed Green regarding the driving of the BMW; sent a letter containing false allegations to Green; undermined Green's authority in the department; denied psychological evaluations for applicants in the department; verbally harassed Green; allowed Caucasian employees to violate the established chain of command and refused to allow Green to promote employees within the department.  Further, Collins

37

made decisions such as striping of patrol cars and interviewing candidates for open positions which were Plaintiff's responsibility, and did not interfere with Caucasian department heads' responsibilities.  Collins refused to sign Chief Green's purchase orders which undermined his ability to run his department.

Most illustrative of Collins' discriminatory treatment of Plaintiff is his storming into Plaintiff's office, slamming the door, yelling at him and pointing his finger in his face. Collins admits to yelling at Chief Green and pointing his finger in his face and that the conduct was inappropriate.  There is no evidence in the record that Collins treated Caucasian department heads with such blatant disrespect.  Quite telling is the fact that when Plaintiff complained about Collins, Collins was not investigated or disciplined for this obvious policy infraction.  The difference in treatment Plaintiff's claim receives from that of Crowder establishes discriminatory treatment.

(Doc. 25 at 65-66.)

Despite these allegations,  Green never argues that the terms and/or conditions of his employment were altered by Collins's conduct.  As set forth above, to establish that his work environment was hostile or abusive because of racially discriminatory harassment, Green must establish that his "workplace [was] permeated with racially discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [his] employment."  *Jones v. UPS Ground Freight*, 683 F.3d at 1292.

The record contains undisputed evidence that Collins made changes to Green's responsibilities and duties as Police Chief once he became the City Administrator.  Green objected to many if not all changes instituted by Collins.  Nevertheless, except for the incident of December 11, 2009, in which Green testified Collins yelled at him and pointed his finger at Green, not one of the actions of which Green complains "permeated" his workplace with "discriminatory intimidation, ridicule, [and/or] insult."  *Id.*  Instead, Green

38

complains of discrete decisions that Collins, as Green's superior was authorized to make or disagreements regarding the proper protocol for police department employees making complaints. The fact that Green desired autonomy over the department and its employees does not convert Collins's decisions regarding the police department into discriminatory harassment. No reasonable person in Green's position would find that Collins's conduct permeated the work environment with racially discriminatory intimidation, ridicule, and/or insult sufficient to alter Green's working conditions. Considering all of the incidents of which Green complains, the court finds no reasonable jury could find that Collins's conduct created an abusive or hostile work environment for Green based on his race.

Therefore, defendant's Motion for Summary Judgment as to plaintiff's racial harassment claim will be granted.

## B. RETALIATION

### 1. Suspension

The court assumes that Green can establish a prima facie of retaliation with regard to his suspension. However, for the reasons set forth above, the court finds that Green has not submitted sufficient evidence to allow a reasonable jury to find that defendants' articulated reasons for his suspension are unworthy of credence and/or the real reason was retaliation for filing a Charge of Discrimination with the EEOC.

Therefore, defendants' Motion for Summary Judgment will be granted as to plaintiff retaliation claim based on his suspension.

**2. Retaliatory Harassment**

The Eleventh Circuit has recognized a cause of action for retaliatory harassment. *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012). In so doing, the court established that this cause of action, like other claims based on a hostile work environment, required a jury "to conclude that the actions complained of were sufficiently severe or pervasive to alter the terms and conditions of employment, thus constituting an adverse employment action." *Id*.

Because this court has determined that Green has not established that the alleged harassing conduct altered the terms and conditions of his employment, summary judgment is due to be granted as to his claim of retaliatory harassment. Defendants' Motion for Summary Judgment as to this claim will be granted.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendants are entitled to judgment as a matter of law.  An Order granting defendants' Motion for Summary Judgment, (doc. 18), will be entered contemporaneously with this Memorandum Opinion.[11]

**DONE**, this 31st day of March, 2014.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE

---

[11]Although the court finds defendants' Motion for Summary Judgment is due to be granted, the court commends plaintiff's counsel for their excellent and helpful charts pertaining to the evidence which were presented to the court at oral argument on defendants' motion and a follow-up chart that was submitted after oral argument.